## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

**RALPH UPCHURCH,**
**and other persons similarly situated,**

**Plaintiff,**

v.

Civil Action No. _____   CIV-22-652-G

**CEBRIDGE ACQUISITION, LP,**
**CEQUEL III COMMUNICATIONS I, LLC,**
**CEQUEL III COMMUNICATIONS II, LLC,**
**& ALTICE USA,**

**Defendants.**

## COMPLAINT

Plaintiff, Ralph Upchurch, on behalf of himself and all others similarly situated (the "Class" as defined below), by counsel The Hoch Law Firm, PC, The Webb Law Centre, PLLC, Franklin Scott Conway LLP, and Talcott Franklin P.C. alleges the following against Cebridge Acquisition, LP, Cequel III Communications I, LLC, and Cequel III Communications II, LLC, each d/b/a Suddenlink Communications, and Altice USA (collectively referenced as "Suddenlink" or "Defendants"), on information and belief:

1.     This dispute takes place under the shadow of Suddenlink's ever-changing unconscionable self-contradicting adhesion contract ("Suddenlink may, in its sole discretion, change, modify, add or remove portions of this Agreement at any time.") and failure "to provide safe, adequate and reliable service … by, *inter alia,* intentionally reducing its maintenance work and maintenance budget, reducing full-time employees, changing its methods of communicating with its subscribers and ignoring the thousands of customer complaints that resulted." The Public Service Commission of West Virginia (the "Commission"), February 9, 2022 Commission Order

Original content © 2022 Talcott Franklin P.C.
No claim to government works.

(the "Order"). The same problems that plague West Virginia Suddenlink customers also plague Oklahoma Suddenlink customers.

2.       Enforcing this adhesion contract would allow Defendants to continue mass-marketing services that are continuously, persistently, and routinely defective, and preclude customers like Plaintiff from pursuing claims that sound in the nature of consumer fraud and breach of warranty. Despite Plaintiff's many attempts to obtain resolution, Defendants continue to sell Plaintiff services that continuously, persistently, and routinely fail to perform as intended or expected.

3.       Defendants' wholly inadequate services have not only severely damaged Plaintiff, but also damaged the ability of Oklahoma residents and businesses to engage in commercial competition, obtain information, communicate, and enjoy entertainment in a digital age. Meanwhile, citizens of similarly situated states enjoy service superior to that provided by Defendants. As a result, Defendants' failures significantly impede the quality of life and business of Oklahomans. The impact of those failures was significantly magnified when many Oklahomans were required to engage in remote learning or work using Defendants' inadequate services. Further, Suddenlink's services, had they functioned properly, would have been useful in providing a semblance of the human interaction that was missing during the lockdowns and social distancing that resulted from the pandemic.

4.       Suddenlink's adhesion contract seeks to impose arbitration as to some claims, but requires this Court to determine others, forcing Plaintiff to file in this forum:

> All issues are for the arbitrator to decide, except that issues relating to arbitrability, the scope or enforceability of this arbitration provision, or the interpretation of its prohibitions of class, representative, and private attorney general proceedings and non-individualized relief shall be for a court of competent jurisdiction to decide.

Suddenlink Agreement ("SA") 24(e).

5.    Plaintiff desires to compel Suddenlink to improve its services. Suddenlink's adhesion contract, however, deprives the arbitrator of any such power: "neither You nor Suddenlink may seek, nor may the arbitrator award, non-individualized relief that would affect other account holders." SA 24(h).

6.    Because as a practical matter any improvement in Defendants' services to Plaintiff would necessarily benefit other Suddenlink customers, the filing of this Action is necessary to provide Plaintiff complete relief against Defendants.

## I.    PARTIES, JURISDICTION, AND VENUE

7.    Plaintiff Ralph Upchurch is an individual domiciled in Paul's Valley, Oklahoma. Plaintiff has been a customer of Suddenlink since at least 2019.

8.    Defendant Cebridge Acquisition, LP is a Delaware limited partnership with its principal place of business in San Angelo, Texas.

9.    Defendant Cequel III Communications I, LLC is a Delaware corporation with its principal place of business in Long Island City, New York.

10.    Defendant Cequel III Communications II, LLC is a Delaware corporation with its principal place of business in Long Island City, New York.

11.    Defendant Altice USA is a Delaware corporation with its principal place of business in Long Island City, New York.

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

13.    Venue in this Court is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district, where Plaintiff

received services from Suddenlink. Suddenlink is a service provider and can be found in this judicial district, where it purports to provide cable television service, which it refers to as "Video Service"; high speed data service, which it refers to as "High Speed Internet Service"; voice service, which it refers to as "Phone Service"; and other related services.

## II.    BACKGROUND

### A.  The Commission Order Regarding Video Service

14.    "The purpose of the Public Service Commission is to ensure fair and prompt regulation of public utilities; to provide for adequate, economical and reliable utility services throughout the state; and to appraise and balance the interests of current and future utility service customers with the general interest of the state's economy and the interests of the utilities." http://www.psc.state.wv.us/missionstatement.htmhttp://www.psc.state.wv.us/missionstatement.htm.[1]

15.    The Commission found in its February 9, 2022 Commission Order (the "Order") that: "In 2015, Altice N.V. (dba Altice USA, hereinafter, Altice) acquired the facilities and customers of Cebridge Telecom WV, LLC, which gave it control of Cequel Corporation, and others, all of which were doing business as Suddenlink Communications in the State of West Virginia. Case No. 15-0878-T-PC (Altice Acquisition Case) (Commission Orders dated July 21,

---

[1] According to West Virginia Code § 24-1-1(a): "It is the purpose and policy of the Legislature in enacting this chapter to confer upon the Public Service Commission of this state the authority and duty to enforce and regulate the practices, services and rates of public utilities in order to: (1) Ensure fair and prompt regulation of public utilities in the interest of the using and consuming public; (2) Provide the availability of adequate, economical and reliable utility services throughout the state; (3) Encourage the well-planned development of utility resources in a manner consistent with state needs and in ways consistent with the productive use of the state's energy resources, such as coal; (4) Ensure that rates and charges for utility services are just, reasonable, applied without unjust discrimination or preference, applied in a manner consistent with the purposes and policies set forth in article two-a of this chapter and based primarily on the costs of providing these services".

2015 and August 20, 2015). Altice continues to provide cable television service in this State as Suddenlink, offering service to more than 300,000 households and small businesses over a hybrid fiber optic- coaxial network with more than 8,500 plant miles and eight headends across West Virginia." Order at 3.

16.     According to the Order, Altice painted a "rosy picture" concerning "its qualifications, capabilities and intentions with respect to its West Virginia operations. ... Altice touted itself as: '[A] leading provider of communications services (cable television, high-speed broadband Internet and fixed-line telephony) in Western Europe, Israel, the French Overseas Territories and other regions.'" *Id.* at 26.

17.     Altice further told the Commission that:

Altice's operational expertise, scale and resources, will enable Cequel [Suddenlink] to accelerate network investment while maintaining a superior level of reliability and customer support.

Altice already has considerable experience as an owner of existing video, telephony, and broadband service providers that will enable it to contribute global strategic insights to Cequel's [Suddenlink's] current and future operations.

Altice has a demonstrated history of investing in existing video, telephony and broadband service providers and making strategic investments that enhance their value proposition for consumers. In some cases this has manifested itself through investments in network infrastructure, which has resulted in higher broadband speeds for subscribers. In other cases, this has manifested itself through accelerations in existing planned network investment and deployment, bringing improved services to market faster. And in still other cases, it has resulted in the expansion of service offerings, thereby expanding consumer choices and enhancing competition.

*Id.*

18.     The Order states that Altice voluntarily described itself as follows:

Altice has taken steps to migrate legacy information technology systems to newer platforms, resulting in operational efficiencies and overall improvements to the customer experience. In other cases, Altice has enhanced the customer experience by focusing on the deployment of improved set-top boxes that can enable

consumers to navigate its panoply of service offerings with greater speed and efficiency. Altice and its operating affiliates also have taken steps in the past to simplify and improve their product offerings so that consumers have a clearer understanding of what they are purchasing and the differences in price points for 9 various service options.

*Id.* at 26-27.

19.    A May 20, 2015 Suddenlink press release announcing the acquisition noted: "Suddenlink represents an excellent fit for the Altice Group and will benefit from the operational expertise, scale and investment support that are at the core of the Altice business model." https://altice.net/sites/default/files/pdf/689389.pdf.

20.    Prior to the Altice acquisition of Suddenlink, Suddenlink had "a well invested, leading broadband network across its footprint, … [and] a strong operational and financial growth track record. Suddenlink's focus on service, innovation and investments provide a strong basis for extending its market leadership and growth momentum." *Id.*

21.    Despite what it told the Commission, Altice had a different story for the stock market. Analysts at ING wrote in a research note that Altice was aiming for $215 million in cost savings per year at Suddenlink, while Reuters stated that "Altice is expected to apply its usual formula at Suddenlink, namely aggressive cost cuts and attention to profit instead of volume of customers."

22.    By 2017, Altice USA CEO Dexter Goei bragged that Suddenlink had taken out at least half of the targeted costs, with more cuts to come. "We're turning the screws a little more," Goei said, despite the facts that the low hanging cost cutting fruit had been picked and further reductions would severely impair service. At the same time, Goei crowed that Suddenlink's 47.3% profit margins were the highest in the U.S. cable industry. https://www.nexttv.com/news/altice-usa-closer-cost-cutting-goal-411418.

23.     The shift to aggressive cost cuts and attention to profit from "Suddenlink's focus on service, innovation and investments" had significant consequences for Oklahomans and, similarly, West Virginians: "Since … Altice took over operations in West Virginia, the Commission received as of August 26, 2021, in excess of 2,764 customer complaints regarding Suddenlink's service, with approximately 1,900 of those complaints being received since 2019." Order at 3.

24.     The Commission initiated Case No. 21-0515-CTV-SC-GI "because of the volume of customer Complaints and the Commission was not pleased with Suddenlink's initial response to this very serious matter. The Commission opened a show cause proceeding as to why Suddenlink should not be required to take specific remedial steps and why the Commission should not impose penalties as authorized by state law." *Id.*

25.     After hearing the evidence, including Suddenlink's response and testimony, the Commission made the following findings of fact:

> 1. In West Virginia, Suddenlink has a potential customer base of more than 300,000 households and small businesses. It provides service over a hybrid fiber optic- coaxial network with more than 8,500 plant miles and eight headends across the State. Suddenlink Letter at 4 (June 7, 2021).

> 2. Suddenlink has 133,794 actual subscribers of cable television service in West Virginia. Suddenlink's Cable Television Annual Reports as of June 3, 2020 (Cable Television Form 7, Schedule C).

> 3. The Commission received in excess of 2,764 customer complaints regarding Suddenlink's service, as of August 26, 2021, with approximately 1,900 of those complaints being received since 2019. Staff Ex. 6; Suddenlink Letter at 2 (June 7, 2021).

> 4. Suddenlink did not report to the Commission cable service outages that last over twenty-four hours. Tr. II at 46-47; 124-125.

> 5. Suddenlink customers cannot request a credit for a qualifying outage when they call to report the outage. A customer has to call a second time, after the outage, to request a credit. Tr. II at 106-107, 124-125, 211; Staff Ex. 6.

6. When calling to report a service issue, Suddenlink customers oftentimes have to wait days or weeks for a service technician. Tr. II at 32; Staff Ex. 6; Customer Complaints and Comments, generally.

7. Suddenlink lacked an effective escalation policy; therefore, customers were unable to speak to a supervisor upon request. Customers were not provided a callback as promised. Tr. I at 221-222; Tr. TI at 127-128; Staff Ex. 7; Customer Complaints and Comments, generally.

8. Suddenlink has implemented a new Supervisor Escalation Process and it agreed to provide Staff with monthly data regarding the process. Tr. I at 256; 245-248.

9. Customers have experienced long wait times and no call back when making calls to Suddenlink. Tr. I at 267.

10. Suddenlink does not provide Basic Tier 1 cable service in the area of Sissonville, West Virginia. Tr. II at 49; Co. Ex. 3.

11. Suddenlink did not post customer payments timely, which resulted in customers' service being terminated and/or incurring late fees. Tr. II at 131-132.

12. Suddenlink charged excessive late fees in West Virginia during the year 2020. Tr. II at 97; Staff Ex. 5.

13. Suddenlink currently operates in 31 West Virginia counties and has 115 service areas, yet it only operates seven business centers in the State. Tr. 11 at 133-134; Staff Ex. 7.

14. Suddenlink significantly decreased the amount of its outside plant maintenance in year 2018, and continued to decrease its maintenance and expenditures until year 2021. Commission Post-Hearing Requested Exhibits 1A and 1B (Confidential); Tr. I at 28; Tr. at 186-187; Tr. I at 338.

15. During the term of Altice's Technical Service division's operation, it stopped doing plant maintenance entirely. Tr. I at 338.

16. There is a correlation between the decrease in amounts spent on outside plant maintenance and the increase in customer complaints for the years 2018-2020. Staff Ex. 6.

17. Suddenlink does not do vegetation management unless it is working on a cable line where vegetation is an issue. It relies on the electric companies to maintain the vegetation along the lines. Tr. I at 143.

18. The Commission received complaints and customers provided comments regarding inconsistent billing, oftentimes involving increases for no known reason. Customer Complaints and Comments, generally.

19. Suddenlink is in the process of combining all of its surcharges with its base fees for service. Tr. I at 302-303.

20. Suddenlink has improperly accounted for and remitted E-911 fees in certain West Virginia counties. Tr. II at 106; Staff Ex. 6. See also Wayne County Commission v. Cebridae Telecom WV, LLC dba Suddenlink Communications, Case No. 20-0752-T-C (Recommended Decision dated June 23, 2021, final July 13, 2021).

21. Suddenlink had 28 expired franchise agreements and four that were to expire by the end of 2021. Staff Ex. 5.

22. Suddenlink has not been using the Commission's Form No. 2 for its franchise agreements or an agreement that contains all the standards set forth in the Cable Rules. Tr. 11at 94.

23. Suddenlink does not always file a formal application (Form No. 1) for a franchise agreement renewal, and does not pay the $250 fee, when the time period reaches the 120-day period before expiration, but continues with an informal process. Tr. II at 57-59.

24. Suddenlink provides in-house training for its employee technicians, but only requires contractors to complete virtual training for general cable television knowledge. In addition to virtual training, Suddenlink also uses a "train the trainer" method for Suddenlink specific items, which involves Suddenlink training one person within a contractor's organization and that person training other individual technicians in the contractor's organization. Tr. II at 109-110; Staff Ex. 6.

25. Suddenlink's contractors were not properly registered and licensed to do business in West Virginia. Tr. II at 108.

26. Suddenlink has metrics that use key performance indicators (KPIs) to measure its employees' and contractors' performance. The KPIs include showing up for service calls on time, whether jobs are completed on the first visit correctly without a second visit. KPIs also measure customer feedback about Suddenlink's technician's performance. Tr. I at 33-35.

27. Suddenlink directly monitors its employees' performance and performs random quality checks, whereas contractor organizations are responsible for monitoring their individual contractors' performance. Tr. II at 108; Staff Ex. 6.

28. In West Virginia Suddenlink employs 43 field technicians and 32 outside plant construction technicians, for a total of 75, and it has 83 contractors to perform installations. Tr. II at 120; Staff Ex. 6.

29. Suddenlink has 33 full-time employees and two contractors in its Beckley office. In Charleston, the largest city in the State, it has one full-time employee for outside plant and the rest are contractors, for a total technician count of 26. The Company does not have any full-time employees or contractors based in the Elkins office. Tr. at 53-60; City's Cross Ex. 2.

30. Suddenlink has no employee field technicians in its Buckhannon, Charleston, Point Pleasant and Wayne service areas, and only employs one outside plant technician in Charleston, Point Pleasant and Wayne. Staff Ex. 6.

31. In 2017, after Altice acquired Suddenlink, it closed its only West Virginia call center and also closed a dispatch training center that was located in West Virginia and began routing its customer calls to call centers located outside of the United States. Staff Ex. 6.

32. In 2019, Suddenlink answered only 36 percent of calls in the United States; five percent in 2020; and routed only two percent of calls to representatives in the United States in 2021. The call centers are located in Egypt, Jamaica, Dominican Republic, South Africa and Columbia. Id.; Staff Ex. 9.

33. As the number of customer calls handled internationally increased, so did the number of customer complaints, many of which involved: Long wait times to speak to a representative; appointments for service technicians not being made promptly, but being scheduled days and weeks out; an inability to escalate calls to supervisors; and customers that were unable to effectively communicate with the call center representatives. Tr. at 105; Staff Ex. 6.

34. Suddenlink complaints increased in 2017 to 193 (an increase from 118 in 2016), and continued to increase in subsequent years as follows: 316 in 2018; 585 in 2019; an astounding 1005 in 2020; and a count of 665 through August 26, 2021. Staff Ex. 6.

35. Suddenlink has a call center located in Texas, which prioritizes business customers and rarely handles non-business customer calls. Tr. I at 249; 306-308.

36. Suddenlink intends to open another call center in the United States. Tr. I at 218-220; 306.

37. Once Altice took over operations, it intentionally reduced its maintenance work and maintenance budget, reduced staff, changed its methods of communication with subscribers and ignored the thousands of resulting customer complaints. Staff Ex. 9; Transcript, generally; Case file, generally.

38. Since the date Altice consummated its purchase of Suddenlink on December 21, 2015, it has violated the West Virginia Act on a daily basis by, *inter alia*, failing to provide safe, adequate and reliable service to its subscribers. Id.

26.    The Commission also made Conclusions of Law, including:

1. W. Va. Code § 24D-1-1 *et seq.*, the Act, imposes legal requirements on providers of cable television service.

2. Suddenlink does not employ enough full-time outside plant personnel or enough full-time service technicians, thereby violating W. Va. Code § 24D-1-14(a), by failing to maintain its facilities in a condition that provides safe, adequate and reliable service to its West Virginia subscribers. Tr. II at 109; Tr. I at 330-331.

3. Since Altice took over, Suddenlink cable television service has not been safe, adequate or reliable as required by W. Va. Code § 24D-1-14(a); Tr. I at 159-163.

**B.  The Order's Findings Apply to All Suddenlink Services**

27.    The Commission's findings of fact concerning Suddenlink's provision of cable services apply equally to Suddenlink's provision of High Speed Internet Service and Phone Service not just in West Virginia, but also in Oklahoma.

28.    Suddenlink utilizes the same infrastructure and processes to provide all of its services, including Video Service, High Speed Internet Service, and Phone Service.  Therefore, the problems the Commission identified as plaguing Suddenlink's provision of Video Service also plague Suddenlink's provision of High Speed Internet Service and Phone Service.

29.    Suddenlink's "High Speed Internet Service" is deceptively named, as it is not "High Speed" and, is also not a "Service", to the extent "Service" is defined as "an act of helpful activity".

Dictionary.com (definition 1 of "service" as a noun). Suddenlink's "Phone Service" suffers from the same defect.

30. The American Customer Satisfaction Index Telecommunications Study (the "ACSI Study") published on June 8, 2021, "is based on interviews with 37,907 customers, chosen at random and contacted via email between April 1, 2020, and March 29, 2021. Customers are asked to evaluate their recent experiences with the largest companies in terms of market share, plus an aggregate category consisting of 'all other'—and thus smaller—companies in those industries." According to the ACSI Study, Suddenlink ranked last in customer satisfaction for subscription television service, internet service providers, and landline phone service. Suddenlink's last place subscription television service customer satisfaction score did not change from the ACSI Study published June 9, 2020, while Suddenlink's 2021 customer satisfaction score decreased 4% for internet and 5% for landline phone from 2020.

31. The 2021 ASCI Study did not comment on Suddenlink's performance, but the 2020 ASCI Study contained the following comments:

a. Subscription television service: "Despite a small uptick to 56, Suddenlink (Altice USA) remains in last place and customers find its bills harder to understand than any other pay TV provider."

b. Internet: "According to ACSI data, Suddenlink's ability to keep outages to a minimum has eroded significantly."

c. Phone: "Across all providers, Suddenlink rates worst in class for staff courtesy and helpfulness."

32. Altice's Better Business Bureau page is similarly telling:



33.    Interestingly, the reason Altice received 1.04 stars rather than 1.0 stars appears to

be primarily due to customer errors in giving Altice more than one star. For example:

## Megan M

                                                                03/20/2022

I signed up for Price for life, total bait and switch! Price keeps going up. Service is terrible. I
have the 1g and nowhere near that speed. Buffers all the time. When you call billing or tech
hard to get a live person and when you do. They are hard to understand. They need to
change their shady practices!

## Mary F

★★☆☆☆                                                                03/17/2022

I was without landlines phone, internet and cable. All were supplied by suddenlink. I
reported outage on 1-15-22. Due to holiday, someone was supposed to come 1-18-22. I was
told that if no one was home,I would be charged. I was home all day. I spoke with sudde link
on 1-19-22 about no technician came. I was told that technician came but no one was home.
I informed them this was not true. Plus fact that I have a ring doorbell, and no technician was
seen on camera. 1-20-22 technician came and left wire across my front yard. Very unsafe for
humans and animals. My services were not restored until 1-21-22. My complaint is being
charged for something that did not happen.

Michael S



HORRIBLE. ABSOLUTELY HORRIBLE. UNPROFESSIONAL. DISCOURTEOUS. HORRIBLE.HORRIBLE.HORRIBLE.HORRIBLE.HORRIBLE. UNFORTUNATELY THEY ARE THE ONLY PROVIDER IN MY BUSINESS AREA. DID I MENTION HORRIBLE.

### C. Defendants' Cost-Cutting Strategy Has No Business Justification

34.     Altice's strategy is to purchase providers, like Suddenlink, that serve areas like Oklahoma where few if any viable alternatives exist for phone, cable, and internet service, and then engage in severe cost-cutting that significantly reduces the quality of services offered.

35.     Because of the dearth of alternatives, Altice also raises rates on its captive customers even as the quality of service declines.

36.     While most CEOs prioritize customer service, Altice CEO Dexter Goei admitted that: "Our fundamental drive is to get more wallet-share and mind-share from our customers." https://www.youtube.com/watch?v=IIONgeg4umU.

37.     Altice CEO Dexter Goei engages in this strategy in the erroneous belief that it will enhance the value of Altice's stock, which is a significant part of his compensation.

38.     However, the shift to aggressive cost cuts and attention to profit away from "Suddenlink's focus on service, innovation and investments" had significant negative consequences for Altice investors.

39.     If an investor purchased $10,000 in Altice stock (NYSE: ATUS) on June 22, 2017, shortly after Altice CEO Dexter Goei pledged to keep "turning the screws a little more" on cost cutting, that investment was worth a mere $3,653.32 as of March 28, 2022. By contrast, a $10,000 investment in the S&P 500 was worth $18,794.50 as of that same date.

40.     The cost-cutting strategy also left Suddenlink vulnerable to competition. Where competitive services arise, Suddenlink's customer base rapidly dissipates, further depressing the share price.

41.     Although Altice CEO Dexter Goei keeps pledging to invest in improved infrastructure, such investments have not materialized in Oklahoma and service for Suddenlink customers continues to deteriorate.

42.     In fact, Altice's recent large expenditures are investments designed to attract more customers to Suddenlink's terrible products and services: A rebranding of Suddenlink as "Optimum" to try and escape the tarnished Suddenlink brand and fool customers into purchasing the same shoddy service under a new name ($20-$30m), new retail stores aimed at selling more bad service ($20-$30m), more door-to-door salespeople working toward the same ($15-$20m), and a Mobile relaunch to tie mobile service to Suddenlink's bad internet, phone, and cable service ($20-$30m).        https://seekingalpha.com/article/4474323-altice-usa-2021-outlook-cut-again-shares-near-all-time-low.

43.     None of these investments will fix Suddenlink's underlying service problems.

44.     In addition, Suddenlink employees and contractors suffer from low morale due to the constant cost-cutting, layoffs, broken infrastructure, and frustration with the inability to provide adequate customer service.

45.     Altice CEO Dexter Goei worsens morale by engaging in bizarre and inexplicable interactions with employees. For example, when trying to recruit for Altice's spinoff Altice Technical Services, Goei's "sales pitch" included a pledge to employees that "We're not bringing in some Mexican guy" to run things. https://stopthecap.com/tag/dexter-goei/.

46.     In exchange for providing the worst service in the industry across all categories, failing to make Suddenlink competitive in markets where it does not hold a virtual monopoly, destroying employee morale, laying off a majority of Suddenlink's competent service employees as too expensive to retain, losing investors' money in a rising stock market, and otherwise running Altice into the ground, Altice CEO Dexter Goei received over \$115 million in compensation between 2017 - 2020.

47.     In 2020, the AFL-CIO reported that "Altice USA, Inc. disclosed that its CEO pay was 644 times its median employee pay for the fiscal year ending in 2020."

**D. Defendants' Unconscionable Adhesion Contract**

48.     On the front page of the Suddenlink website under "Our commitment to you", Suddenlink claimed at least as late as December 2021:



49.     On a Suddenlink page containing FAQs, as part of the Suddenlink re-brand to Optimum, Suddenlink claims that: "Optimum has thrown out contracts, bundles, and hidden fees for choice, transparency, and value."

50.     Despite these prominent claims to offer services "without a contract" and to have "thrown out contracts", Suddenlink simultaneously harbors the covert claim that all customers are bound by an unsigned, internet-posted, ever-changing, take-it-or-leave-it "agreement", which can

only be accessed by scrolling down to the bottom of the Suddenlink website, finding the barely

legible "Terms & Policies", and clicking the link (arrow added to graphic for ease of reference).



51.    Thereafter, customers must scroll through a list of **fifty (50)** terms and policies to

determine which of them apply to the services purchased from Suddenlink:

**General Terms of Service**

- Residential Services Agreement
- Commercial Service Agreement
- Additional Commercial Terms Of Service

**Privacy**

- Suddenlink Privacy Policy
- Suddenlink.net Visitor Privacy Policy
- Financial Privacy Policy
- App Privacy Notice

**Suddenlink.com Website Terms of Use & Privacy Statement**

- Website Terms of Use
- (Terminos Para El Uso de Este Sitio Web)

**Suddenlink High-Speed Internet**

- Additional Terms of Service for High Speed Internet Services (Residential)
- Additional Terms of Service for High Speed Internet Services (Commercial)
- Acceptable Use Policy
- (Politica de uso aceptable)
- Digital Millenium Copyright Act

**Suddenlink Video Service**

- Additional Terms of Service for Video Service (Residential)
- Additional Terms of Service for Video Service (Commercial)

**Suddenlink Phone Service**

- Additional Terms of Service for Phone Service (Residential)
- Additional Terms of Service for Phone and/or Business Hosted Voice Services

**Optimum Mobile Terms of Service**

- Optimum Mobile Customer Service Agreement
- Optimum Mobile AutoPay
- Optimum Mobile Broadband Disclosure Policy
- Optimum Mobile Privacy Policy
- Optimum Mobile Retail Installment Contract
- Optimum Mobile Financial Privacy Policy

**Billing**

- Auto Pay Terms of Service (Formerly EZ Pay Terms & Conditions)
- Paperless Billing Terms and Conditions (Formerly Go Paperless Terms & Conditions)
- Electronic Consent for Paperless Notices

**Promotions, Disclaimers and Official Rules**

- Promotion & Offer Disclaimers
- Cequel Communications, LLC Interactive TV Contest Official Rules

**Support Services**

- Safeguard Terms and Conditions
- Premier Protection & Support Terms of Service
- Premier Technical Support Terms of Service
- Business Premier Technical Support Terms of Service
- Business Premier Protection & Support Terms of Service
- Home Entertainment Protection & Support Terms of Service

**Mobile Apps**

- Altice One App Terms of Use
- Support App Terms of Use

**Financing**

- Retail Installment Contract

**Altice Amplify**

- Altice Amplify Terms of Service
- Altice One Alexa Skill Terms of Service

**Suddenlink Stream**

- Suddenlink Stream Terms of Service

**Television Equipment Compatibility**

- Television Equipment Compatibility

**Product Specific Terms**

- "WiFi Zone" Terms & Conditions
- Suddenlink WiFi Emergency Access Terms of Use
- Connected Home Terms & Conditions
- Suddenlink Business SMART WiFi Service Attachment Additional Terms and Conditions

**Legal**

- FCC Online Public File
- Service of Legal Process - Law Enforcement Agencies
- Peering Agreement
- Security Licenses

52.     If printed in Times New Roman 12 point font, just the "Residential Services Agreement" portion of the Suddenlink adhesion contract is approximately 25 single-spaced pages long, not including the Privacy Policy and Acceptable Use Policy that Suddenlink incorporates into its adhesion contract and can change at any time.  Acceptable Use Policy ("AUP") 2 ("SUDDENLINK MAY REVISE THIS ACCEPTABLE USE POLICY FROM TIME TO TIME WITHOUT NOTICE BY POSTING A SUCH REVISION ON SUDDENLINK.COM OR ANY SUCCESSOR URL. ANY REVISION OF THIS ACCEPTABLE USE POLICY IS EFFECTIVE IMMEDIATELY UPON SUCH POSTING.") (~3.5 single-spaced pages); Privacy Policy 9 ("We may change this Policy at any time.") (~11 single-spaced pages); SA 30 ("This Agreement, including the applicable Additional Terms of Service, Privacy Policy and Acceptable Use Policy ("AUP"), the work/service order presented to You at time of installation ("Service Order") and the Schedule of Fees constitute the entire agreement between Suddenlink and Customer with respect to the Services.").

53.     Even though Suddenlink claims that the voluminous documents listed in the prior paragraph (Residential Services Agreement, Additional Terms of Service, Privacy Policy, Acceptable Use Policy, work/service order, and Schedule of Fees) "constitute the entire agreement

between Suddenlink and Customer with respect to the Services", Suddenlink also claims that the customer may also be bound by any or all of the FIFTY (50) terms and policies listed on the website and pictured above.

54.    Customers have no bargaining power respecting the terms of the Suddenlink adhesion contract.

55.    The Suddenlink adhesion contract imposes no liability on Suddenlink "other than a refund or credit as expressly provided in" the Suddenlink adhesion contract. SA 22. This is no remedy at all because refunds and credits are entirely at Suddenlink's discretion. SA 9 ("Any adjustment or refund, given in each case in Suddenlink's sole discretion, will be accomplished by a credit on a subsequent bill for Service, unless otherwise required by applicable law."). Suddenlink therefore has no liability under the Suddenlink adhesion contract, even if Suddenlink burned down a customer's house (this is not theoretical, *see Midkiff v. Cequel III Communications I, LLC dba Suddenlink Communications*, No. 10-C-34, 2010 WL 3265853 (S.D.W.Va.) ("said cable system and apparatus connected to Plaintiffs' home was energized by high voltage electricity which proximately caused said home and its contents to be completely destroyed by fire.")). Further, through repeated disclaimers and limitations, Suddenlink effectively eliminates any obligations it has under the Suddenlink adhesion contract, meaning any "contract" claim by Suddenlink is void for lack of consideration:

a.    **"No Warranty; Limitation of Liabilit. [sic] Customer expressly agrees that: (a) the Services provided are best efforts services and the Services, Software and Equipment are provided by Suddenlink on an "AS IS" and "AS AVAILABLE" basis without warranties of any kind, either express or implied; (b) the Suddenlink Parties are not responsible or liable for any loss or impairment of service due in whole or in**

part to Customer owned- or provided-Equipment; and (c) all use of the Services, Software and Equipment, including that provided by Third Party Providers, as well as the purchase, download or use of any third party service, product, or application provided by or accessed through the Services or Equipment, are provided at Customer's sole risk and Customer assumes total responsibility for Customer's or any User's use of the Services. Without limiting the generality of the foregoing, the Suddenlink Parties make no warranty: (i) that the Services will be uninterrupted or error free or that the Equipment will work as intended; (ii) as to transmission or upstream or downstream speeds of the network; (iii) that the Services, Equipment or Software are compatible with any Customer owned- or provided-Equipment; or (iv) as to the security of Customer's communications via Suddenlink's facilities or Services, or that third parties will not gain unauthorized access to or monitor Customer's communications. Customer has the sole responsibility to secure Customer's communications and the Suddenlink Parties will not be liable for any loss associated with such unauthorized access. In addition, neither the Suddenlink Parties nor any Third Party Provider of services or products makes any representations or warranties with respect to any product or services offered through the Services or Equipment, and Suddenlink shall not be party to nor responsible for monitoring any transaction between Customer and any Third Party Provider of products or services." SA 22.

b.      "Except for a refund or credit as expressly provided in this Agreement, in no event (including negligence) will the Suddenlink Parties be held responsible or liable for any loss, damage, cost or expense including direct, indirect, incidental,

special, treble, punitive, exemplary or consequential losses or damages including, but not limited to, loss of profits, earnings, business opportunities, loss of data, personal injury (including death), property damage or legal fees and expenses, sought by Customer or anyone else using Customer's Service account: (x) resulting directly or indirectly out of the use or inability to use the Services (including the inability to access emergency 911 or e911 services) and/or use of the Software, Equipment or provided third party services or otherwise arising in connection with the installation, maintenance, failure, removal or use of Services, Software and/or Equipment or Customer's reliance on the Services, Software and/or Equipment, including without limitation any mistakes, omissions, interruptions, failure or malfunction, deletion or corruption of files, work stoppage, errors, defects, delays in operation, delays in installation, failure to maintain proper standards or operation, failure to exercise reasonable supervision, delays in transmission, breach of warranty or failure of performance of the Services, Software and/or Equipment; or (y) resulting directly or indirectly out of, or otherwise arising in connection with, any allegation, claim, suit or other proceeding relating to Services, Software and/or Equipment, or the infringement of the copyright, patent, trademark, trade secret, confidentiality, privacy, or other intellectual property or contractual rights of any third party." SA 22.

      c.    "If Customer resides in a state which laws prevent Customer from taking full responsibility and risk for Customer's use of the Services and/or Equipment, Suddenlink's liability is limited to the greatest extent allowed by law." SA 22.

d.    "Except as otherwise expressly provided in this Agreement, the liability of Suddenlink, its officers, shareholders, directors, employees, affiliates, vendors, carrier partners, content providers and other persons or entities involved in providing the Services or Equipment (collectively, the "Suddenlink Parties") for damages shall in no event, by reason of any delays, interruptions, omissions, errors, failures or defects in installation or service, exceed an amount equal to the Customer's Service charges and associated Equipment fees for a regular billing period ("Maximum Credit")." SA 9.

e.    "No undertaking, representation or warranty made by an agent or representative of Suddenlink in connection with the sale, installation, maintenance or removal of Suddenlink's Services or Equipment shall be binding on Suddenlink except as expressly included herein." SA 30.

f.    "In all events, Suddenlink shall have no liability whatsoever for any damage or loss or destruction of any of Customer's software, files, data or peripherals." Additional Terms of Service for High Speed Internet Services ("Additional Internet Terms" or "AIT") 4.

g.    "Suddenlink shall have no liability whatsoever as the result of the loss or destruction of any information, data, names or addresses." AIT 5.

h.    "Use of the High Speed Internet Services provided by Suddenlink, in addition to third-party products or services provided by or accessed through the High Speed Internet Service or the Internet is at Customer's sole risk and Customer acknowledges that the High Speed Internet Services are provided "**AS IS.**" Accordingly, any information sent through or over the network is sent at Customer's sole risk." AIT 18.

i.      "Suddenlink makes no warranties, with respect to Equipment or Service

provided by Suddenlink or with respect to the Equipment's compatibility with any

Customer Equipment." SA 10.

56.    The complete absence of any obligation on the part of Suddenlink is further

demonstrated by the fact that customers can order and pay for a particular channel and Suddenlink

has no obligation to provide it.  For example, Suddenlink customers can purchase HBO Max for

$19 a month or Cinemax, Showtime, and/or Starz, for $17 a month each.  Each of these is a

"particular channel".   Despite this, the Suddenlink adhesion contract states: "*Customer*

acknowledges and agrees that it *has no right to receive, and Suddenlink has no obligation to*

*provide, any particular programming service or channel* as part of Suddenlink's Video Service

and that Customer is not entering into this agreement or purchasing Suddenlink's Video Service in

reliance on an expectation or promise (explicit or implicit) that any particular programming service

or set of programming services shall be included as part of Suddenlink's Video Service."

Additional Terms of Service for Video Service ("TV Terms" or "TVT") 4(a) (emphasis added).

57.    Suddenlink also claims it can change the Suddenlink adhesion contract at any time

without effective notice to customers.  Indeed, the Suddenlink adhesion contract purports to make

customers responsible for constantly checking the Suddenlink website to see if the Suddenlink

adhesion contract has changed.  When Suddenlink does change its adhesion contract, it provides

no redline or summary of changes, so a customer would have to read the new adhesion contract in

its entirety to determine if any changes were made.  This includes changing not only standard

contract provisions, but also the services provided and the amounts charged:

a.      "Suddenlink may, in its sole discretion, change, modify, add or remove

portions of this Agreement at any time. Suddenlink may notify Customer of any such

changes to this Agreement, or any other required or desired notice hereunder, by posting notice of such changes on Suddenlink's website (www.suddenlink.com), or by sending notice via email or postal mail to Customer's billing address, and/or by contacting the telephone number(s) on Customer's account (including mobile phones) by means such as but not limited to browser bulletins, walled garden (browser interruption), voice, SMS, MMS, and text messages, including by the use of by automatic telephone dialing systems. Customer agrees that any one of the foregoing will constitute sufficient notice. Because Suddenlink may from time to time notify Customer about important information regarding the Services, the Privacy Policy and this Agreement by such methods, *Customer agrees to regularly check* his or her postal mail, e-mail and *all postings on the Suddenlink web site* (www.suddenlink.com) and *Customer bears the risk of failing to do so.* The *Customer's continued use of the applicable Service(s)* following notice of such change, modification or amendment *shall be deemed to be the Customer's acceptance of any such revision. If Customer does not agree to any revision of this Agreement, Customer must immediately cease use of the all Service(s)* and notify Suddenlink that Customer is cancelling this Agreement in accordance with the then-current policy." SA 31 (italics added).

      b.    "Suddenlink may, at any time and in its sole discretion, without notice, change, add to or remove portions of the Suddenlink Video Service (including, without limitation, functionality, hours of availability, Equipment requirements, Equipment, and Services features), and/or institute or otherwise change rates, fees and charges for Suddenlink Video Service, subject to applicable law." TVT 9.

      c.    "Suddenlink may also, at any time and in its sole discretion, without notice, change, add to or remove portions of the High Speed Internet Service (including, without

limitation, content, functionality, hours of availability, Equipment requirements, speed, upstream and downstream limitations, Service features, storage capacity, and protocol filtering) and/or institute or otherwise change rates, fees and charges for the High Speed Internet Service." AIT 13.

d.    "Suddenlink may, at any time and in its sole discretion, without notice, change, add to or remove portions of the Phone Service (including, without limitation, functionality, hours of availability, Equipment requirements, Equipment, and Services features), and/or institute or otherwise change rates, fees and charges for Phone Service, subject to applicable law." Additional Terms of Service for Phone Service ("Additional Phone Terms" or "APT") 9.

e.    "A list of applicable fees ("Schedule of Fees") is available at www.suddenlink.com/pricing-packages. Suddenlink reserves the right to amend or change the Schedule of Fees from time to time." SA 2.

58.    Despite restricting a customer's right to terminate the agreement, Suddenlink can terminate at any time for any reason or no reason. *Compare* SA 15 ('Suddenlink may terminate this Agreement, disconnect any or all Services, and remove Equipment at any time, without prior notice, for any reason whatsoever or for no reason, including, but not limited to, if Customer or a User fails to fully comply with the terms of this Agreement and/or any Suddenlink or authorized Third Party Provider terms of service, agreements or policies incorporated herein by reference.") *with id.* at 1 ("PAYMENTS ARE NONREFUNDABLE AND THERE ARE NO REFUNDS OR CREDITS FOR PARTIALLY USED SUBSCRIPTION PERIODS."), *id.* ("You may cancel Service(s) up to the last day of the billing period prior to the service period that you wish to cancel, and the cancellation will be effective at the end of the then-current billing period. Any request for

cancellation after the commencement of a service period will be effective at the end of the then-current service period."), *id.* at 16 ("Customer further agrees that upon termination of any Service, Customer will immediately cease use of the Equipment and any Software, and; Customer will pay in full the charges for Customer's use of the Service and the Equipment through the later of: (i) Customer's applicable Service month, or (ii) if applicable, the expiration of any promotional term, or, if applicable, (iii) the date when the associated Equipment or Software has been returned to Suddenlink.").

59.     Suddenlink also decides what constitutes a violation of the agreement:

a.      "It shall be a violation of this Agreement for Customer or any User: (1) to engage in any conduct prohibited by this Agreement (or by any terms and conditions incorporated herein by reference); or (2) not to engage in conduct required by this Agreement, each case determined in Suddenlink's sole good faith discretion." SA 14.

b.      "In addition, whether or not the conduct set forth below is elsewhere prohibited by this Agreement, it shall be a violation of this Agreement if: a. Customer or any User fails to abide by Suddenlink's rules and regulations or to pay the charges billed; … f. The amount of customer and/or technical support required to be provided to Customer or any User is excessive in the sole good faith discretion of Suddenlink." SA 14.

c.      "The Services provided under this Agreement are solely for Customer's personal, residential use and Customer shall not use Services for any commercial purpose. Suddenlink shall have the right to determine, in its sole discretion, what constitutes a "commercial" purpose." SA 11(a). "Customer may not use the High Speed Internet Service for commercial or business purposes." AIT 10.

60.    Despite assuming no obligations or liabilities under the Suddenlink adhesion contract, Suddenlink imposes significant obligations and liabilities on customers, such as:

a.    Unlimited indemnities: "Customer agrees to defend, indemnify and hold harmless the Suddenlink Parties from and against any and all claims and expenses, including reasonable attorneys' fees, arising out of or related in any way to the use of the Service and Equipment by Customer or otherwise arising out of the use of Customer's account or any equipment or facilities in connection therewith, or the use of any other products or services provided by Suddenlink to Customer. Customer agrees to indemnify and hold harmless the Suddenlink Parties against claims, losses or suits for injury to or death of any person, or damage to any property which arises from the use, placement or presence or removal of Suddenlink's Equipment, facilities and associated wiring on Customer's premises and further, Customer indemnifies and holds harmless the Suddenlink Parties against claims for libel, slander, or the infringement of copyright arising directly or indirectly from the material transmitted over the facilities of Suddenlink or the use thereof by Customer; against claims for infringement of patents arising from combining with or using in connection with, facilities furnished by Suddenlink, and apparatus, Equipment, and systems provided by Customer; and against all other claims arising out of any act or omission of Customer in connection with the Services or facilities provided by Suddenlink." SA 23.

b.    Attorneys' Fees: "Additional charges may also be imposed if collection activities are required to recover past due balances, including attorney fees." SA 2.

c.    Suddenlink even purports to make customers pay Suddenlink's attorneys' fees if the *customer* needs to protect its rights under the Suddenlink adhesion contract:

"Customer shall pay reasonable collection and/or attorney's fees to Suddenlink in the event that Customer shall find it necessary to enforce collection or to preserve and protect its rights under this Agreement." SA 16.

        d.    Suddenlink even makes customers responsible for the actions of third parties. AUP 1 ("*YOU ARE RESPONSIBLE FOR ANY VIOLATION OF THIS ACCEPTABLE USE POLICY OR MISUSE OF THE SERVICE* THROUGH THE USE OF YOUR ACCOUNT, *EVEN IF THE MISUSE WAS CONDUCTED BY A THIRD PARTY* OR OTHER END USER WITH ACCESS TO YOUR ACCOUNT, WHETHER PERMITTED BY YOU. *IT IS YOUR RESPONSIBILITY* TO SECURE YOUR COMPUTER(S), NETWORK AND/OR ANY DEVICE, INCLUDING WIRELESS NETWORK ("WiFi") DEVICES CONNECTED TO THE SERVICE SO THAT SUCH MISUSE IS PREVENTED.") (italics added).

61.    Juxtaposing other contract terms further demonstrates the Suddenlink adhesion contract's unconscionability:

        a.    While *Suddenlink* has the sole discretion and ability to upgrade the firmware in the cable modem, *customer* assumes all responsibility for *Suddenlink's* failure to upgrade: "Whether the cable modem is owned by Customer or Suddenlink, Suddenlink shall have the unrestricted right, but not the obligation, to upgrade the firmware in the cable modem at any time that Suddenlink, in its sole discretion, determines it is necessary or desirable. Customer assumes all responsibility for any degradation in or problems from the failure to upgrade." AIT 3.

        b.    While *Suddenlink* can assign the agreement, *customer* cannot: "**No Assignment.** This Agreement and the Services and/or Equipment supplied by Suddenlink

are not assignable or otherwise transferable by Customer, without specific written authorization from Suddenlink. In Suddenlink's discretion, Suddenlink may assign, in whole or in part, this Agreement, and Services may be provided by one or more legally authorized Suddenlink affiliates." SA 21.

    c.      If *Suddenlink* fails to bill a customer, the *customer still must pay* the balance when due: "Failure to receive a bill does not release Customer from Customer's obligation to pay. Failure to pay the total balance when due (including checks returned for insufficient funds) shall constitute a breach of this Agreement and may be grounds for termination of Service, removal of Equipment from Customer's premises and/or imposition of a late fee ("Late Fee") in accordance with applicable law." SA 1.

    d.      *Suddenlink* limits the time a *customer* can make a claim, but places no such restriction on itself. *Compare* SA 9 ("Unless otherwise provided by applicable law, in the event any amounts owed by Suddenlink to Customer are not claimed by Customer within one year of the date on which the amount became payable to Customer, Customer shall forfeit all rights to the refund and all such amounts shall become the property of Suddenlink.") & 8 ("Customer agrees to pay all undisputed monthly charges and all applicable fees and taxes as itemized on the Suddenlink monthly bill and notify Suddenlink in writing of disputed items or requests for credit within thirty (30) days of Customer's receipt of the bill for which correction of an error or credit is sought, or longer as provided by applicable law.") *with* SA 20 ("**No Waiver.** The failure of Suddenlink to enforce this Agreement and any of its components, for whatever reason, shall not constitute a waiver of any right of Suddenlink or the ability to assert or enforce such right at any time in the future."), 13 ("Suddenlink's failure to remove its Equipment shall not be deemed an

abandonment thereof."), & 16 ("Failure of Suddenlink to remove Equipment shall not be deemed an abandonment thereof.").

e.     If a customer attempts to use the services while impaired, the customer is barred from receiving a credit: "No credit allowance will be made for interruptions of Service that are: […] e. during a period in which Customer continues to use the Service on an impaired basis". SA 9. Given Suddenlink's unhelpful call centers, the customer has no way to know whether the services are working other than to attempt to use them.

62.     Despite the fact that service takes place in Oklahoma, the Suddenlink adhesion contract negates Oklahoma state law and imposes federal and New York law: "Subject to Section 24.g above, this Agreement shall be governed by the laws of the state of New York."  SA 25. "Because the Service(s) provided to You involves interstate commerce, the Federal Arbitration Act ("FAA"), not state arbitration law, shall govern the arbitrability of all disputes under this arbitration provision. Any state statutes pertaining to arbitration shall not be applicable." SA 24(g).

63.     Not content to bind the customer solely to the adhesion contract, Suddenlink seeks to bind customers to even more requirements, including new terms at the time of installation: "This Agreement, including the applicable Additional Terms of Service, Privacy Policy and Acceptable Use Policy ("AUP"), the work/service order *presented to You at time of installation* ("Service Order") and the Schedule of Fees constitute the entire agreement between Suddenlink and Customer with respect to the Services." *Id*. 30 (italics added).  Suddenlink's use of the phrase "presented to you" rather than "offered to you" demonstrates the disparity of bargaining power between the parties to the Suddenlink adhesion contract.

**E.  Plaintiff's Suddenlink Experience**

64.  Plaintiff has experienced Suddenlink's constant service interruptions, frustrating customer telephone service calls, contradictory or illogical explanations, and ineffective in-person service calls throughout Suddenlink's service period.  Plaintiff's Suddenlink experience is consistent with the Order's findings of fact.

65.  Consistent with the Order, a Suddenlink technician has told Plaintiff that his connection speeds look like a heart monitor because they wildly fluctuate up and down.  The problem is not in the home, but due to Suddenlink's infrastructure.

66.  Suddenlink's continual and unrelenting failures to act caused Plaintiff and Plaintiff's family to suffer extreme frustration, anger, despondency, helplessness and other emotional damage that no reasonable person should be expected to endure.

**F.  Suddenlink's Rigged Arbitration Scheme**

67.  In September 2021, Suddenlink's arbitration provision read:

> Except as otherwise provided in this arbitration provision, Suddenlink will pay all arbitration filing, administrative, and arbitrator fees for any arbitration that Suddenlink commences or that You commence seeking damages of $10,000 or less.

Suddenlink Agreement as of September 24, 2021 ("September Suddenlink Agreement" or "SSA") 24(e).

68.  On October 1, 2021, without effective notice and without obtaining Plaintiff's affirmative consent, Suddenlink changed the arbitration provision to read:

> If You initiate an arbitration, You will be responsible for paying a portion of the arbitration fees as follows: If You are seeking claims of $1,000 or less, Your share of the fees will be capped at $100, and If You are seeking claims of between $1,001-$10,000, Your share of such fees will be capped at $200. If You are seeking claims of more than $10,000, the filing, administrative and arbitrator fees will be allocated in accordance with the AAA rules.

SA 24(f).

69.     Under Suddenlink's new arbitration scheme, a customer initiating arbitration must pay AAA a minimum of $100, which in many instances is more than the amount at issue in the dispute.  An example of this is a $60 service charge for a technician visit that fails to resolve the problem.

70.     Suddenlink claims that: "Resolving Your dispute with Suddenlink through arbitration means You will have a *fair hearing before a neutral arbitrator* instead of in a court before a judge or jury." SA 24(a) (italics added).  Suddenlink then names the American Arbitration Association ("AAA") as the arbitrator, and immediately saddles AAA with a conflict of interest: "If the AAA will not enforce this arbitration provision as written, it cannot serve as the arbitration organization to resolve Your dispute." SA 24(e).  Aside from threating AAA's economic interest, this provision directly contradicts Suddenlink's requirement that: "All issues are for the arbitrator to decide, *except that issues relating to arbitrability, the scope or **enforceability** of this arbitration provision*, or the interpretation of its prohibitions of class, representative, and private attorney general proceedings and non-individualized relief *shall be for a court of competent jurisdiction to decide*." SA 24(e) (emphasis added).  By the very terms of the Suddenlink adhesion contract, AAA cannot "serve as the arbitration organization to resolve" the dispute because only a court can decide "issues relating to ... enforceability of this arbitration provision".

71.     Furthermore, imposing a conflict of interest on AAA ensures that Plaintiff cannot receive a "fair hearing before a neutral arbitrator":

> expert and trustworthy judgment in individual situations . . . is what makes members of the profession useful. A conflict of interest makes that judgment unreliable just when reliability is needed. A conflict of interest is therefore always considered a threat to the good that the profession seeks to achieve and is often also a threat to the profession's reputation. That is what makes having a conflict of interest a serious concern in professional ethics.

Michael Davis & Josephine Johnston, *Conflict of Interest in Four Professions: A Comparative Analysis,* CONFLICTS OF INTEREST IN MEDICAL RESEARCH, EDUCATION, AND PRACTICE 304–05 (Bernard Lo and Marilyn J. Field eds., 2009).

72.    Suddenlink also contradicts itself concerning the time to initiate arbitration.  The Suddenlink adhesion contract states that: "For Your convenience, You may download a Notice of Dispute form from our website at Suddenlink.com/NoticeofDispute."  24(c)(i).  Clicking the link produces a form that states, in part: "If the dispute is not resolved to your satisfaction within thirty (30) days of Suddenlink's receipt of the dispute, you may begin arbitration by submitting a Demand    for    Arbitration    to    the    American    Arbitration    Association    ("AAA")." https://www.suddenlink.com/sites/default/files/2021-02/Suddenlink-Notice-of-Dispute-Form-Update-1-28-21.pdf.  However, according to the Suddenlink adhesion contract, "If Suddenlink and You do not reach an agreement to resolve the dispute within 60 days from when the Notice of Dispute is received, You or Suddenlink may start arbitration proceedings."  SA 24(c)(ii).

73.    Under the Suddenlink arbitration scheme, the arbitrator may not award relief that "affects other Suddenlink account holders":

> **YOU AGREE TO ARBITRATE YOUR DISPUTE AND TO DO SO ON AN INDIVIDUAL BASIS; CLASS, REPRESENTATIVE, AND PRIVATE ATTORNEY GENERAL ARBITRATIONS AND ACTIONS ARE NOT PERMITTED.** You and Suddenlink agree that each party may bring claims against the other only in Your or its individual capacity and may not participate as a class member or serve as a named plaintiff in any purported class, representative, or private attorney general proceeding. This arbitration provision does not permit and explicitly prohibits the arbitration of consolidated, class, or representative disputes of any form. In addition, *although the arbitrator may award any relief that a court could award that is individualized to the claimant and would not affect other Suddenlink account holders, neither You nor Suddenlink may seek, nor may the arbitrator award, non-individualized relief that would affect other account holders.* Further, the arbitrator may not consolidate or join more than one person's claims unless all parties affirmatively agree in writing.

SA 24(h) (italics added).

74.    Because the problem with Plaintiff's service is "in the network", Plaintiff cannot obtain complete relief through the Suddenlink arbitration scheme because any change to the network would necessarily affect other Suddenlink account holders.

75.    Suddenlink also engages in a cynical ploy, allowing a customer to avoid the arbitration clause. SA 24(b). Thereafter, however, Suddenlink can create a new arbitration provision and claim the prior opt-out does not apply. SA 24(b) ("**OPTING OUT OF THIS ARBITRATION PROVISION HAS NO EFFECT ON ANY OTHER PRIOR OR FUTURE ARBITRATION AGREEMENTS THAT YOU MAY HAVE WITH SUDDENLINK.**"). A customer wishing to avoid the arbitration clause would have to be forever vigilant, constantly checking the Suddenlink website for changes to the arbitration provision that Suddenlink would claim constitutes a "future arbitration agreement" unless the customer takes action to opt out.

76.    Based on a reading of the Suddenlink arbitration provision, and assuming the customer is not familiar with the law in Oklahoma, a customer would "know" that:

a.    Arbitration will cost at least $100-$200, but if the claim exceeds $10,000, then the unknown "filing, administrative and arbitrator fees will be allocated in accordance with the AAA rules." SA 24(f).

b.    The *customer* must pay "collection and attorney's fees *to Suddenlink*" in the event the *customer* finds it necessary to protect its rights under the Suddenlink adhesion contract. SA 16.

c.    If the Arbitrator decides customer's claim is frivolous under Federal Rule of Civil Procedure 11(b) (which is not described), then customer must reimburse Suddenlink for "any amounts Suddenlink may have paid on [customer's] behalf." SA 24(f).

77.    A rational customer might thereafter read the remainder of the Suddenlink adhesion contract to see what kind of relief is available, and would discover that:

a.    It is impossible for Suddenlink to breach the Suddenlink adhesion contract because Suddenlink assumes no responsibilities and make no warranties to do anything; and,

b.    Suddenlink's liability is limited to credits on future bills, and Suddenlink gets to determine the amount of those credits.

78.    Thus, a rational customer would likely conclude that if the arbitrator applies the Suddenlink adhesion contract to the claim, the customer will receive an "award" in the form a future credits to be determined solely by Suddenlink.  The customer would then weigh this anticipated relief against the $100+ AAA fee and the requirement to pay Suddenlink's attorneys' fees, and immediately conclude that the cost of arbitration vastly exceeds the relief obtainable.

79.    Even if the customer learned that Oklahoma courts would take a dim view of these circumstances, the customer would be dejected to discover that the Suddenlink adhesion contract applies the law of New York, a state in which, if you leave your door unlocked, everyone blames you for being robbed instead of blaming the perpetrator.

80.    Notably, no part of the transaction from the customer point of view takes place in New York.  The few Suddenlink service centers are located in Oklahoma.  Service technicians are located in Oklahoma.  The services are delivered in Oklahoma.  Customer service representatives are clearly offshore, located in some unknown distant land.  That some Defendants headquarter in New York or Missouri has no impact on the customer.  New York only comes into play when the customer mails a notice of dispute to Suddenlink as a prelude to arbitration.

81.    Further, Suddenlink gave notice that it intends to yet again change its arbitration provision, effective July 20, 2022.

82.    The new arbitration provision adds section 24(g), which provides that:

If 25 or more claimants submit Notices of Dispute or file arbitrations raising similar claims and are represented by the same or coordinated counsel, all the cases must be resolved in staged bellwether proceedings. You agree to this process even though it may delay the resolution of your claim. In the first stage, each side shall each select up to 15 cases (30 cases total) to be filed in arbitration and resolved individually by different arbitrators. In the meantime, no other cases may be filed in arbitration, and the AAA shall not accept, administer, or demand payment of fees for arbitrations commenced in violation of this Mass Arbitration Procedures section. If the parties cannot agree how to resolve the remaining cases after the conclusion of the first stage of bellwether proceedings, the process will be repeated until all claims are resolved.

83.    This acts to discourage a customer from hiring counsel that has litigated or arbitrated more than 25 cases against Suddenlink, as Suddenlink notes that "it may delay the resolution of your claim."

84.    The new arbitration provision also adds section 24(j), which provides that:

Notwithstanding any provision in the Agreement to the contrary, You and Suddenlink agree that if Suddenlink makes any amendment to this arbitration provision (other than an amendment to any notice address or website link provided herein) in the future, that amendment shall apply to all disputes or claims that have arisen or may arise between You and Suddenlink, including disputes or claims that arose prior to the effective date of the amendment. We will notify you of amendments to this arbitration provision in the manner described in Section 31. If you do not agree to the revisions, you must cease use of all Service(s) within 30 days and notify Suddenlink that You are canceling this Agreement.

Thus, Suddenlink can change the arbitration provision to the detriment of a customer *during an arbitration*.

85.    The probable impact of the Suddenlink adhesion contract on the customer makes it apparent that Suddenlink unilaterally seeks to misuse the honorable mechanism of arbitration as a

scheme to shield itself from legal accountability and to rely upon arbitration as an artifice to defraud a weaker party of rights clearly provided by the common law or statute.

86.    In the event this Court enforces all or part of the arbitration provision, this Court should impose on Suddenlink the full effect of its language by requiring Suddenlink to use a separate arbitrator for each customer and depriving Suddenlink of any efficiencies related to defending a mass or class action.  The arbitration clauses repeatedly call for this result:

a.    "This arbitration provision *does not permit and explicitly prohibits the arbitration of consolidated*, class, or representative *disputes of any form*."  SA 24(h) (emphasis added).

b.    "Any and all disputes arising between You and Suddenlink, or Your or it's [sic] respective predecessors in interest, successors, assigns, and past, present, and future parents, subsidiaries, affiliates, officers, directors, employees, and agents, shall be resolved by binding *arbitration on an individual basis* in accordance with this arbitration provision. This agreement to arbitrate is intended to be *broadly interpreted*.") SA 24(a) (emphasis added).

c.    **"YOU AGREE TO ARBITRATE YOUR DISPUTE AND TO DO SO ON AN INDIVIDUAL BASIS"**.  SA 24(h).

d.    "Further, the *arbitrator may not consolidate or join more than one person's claims* unless all parties affirmatively agree in writing."  SA 24(h) (emphasis added).

87.    Otherwise, Suddenlink will be preserving for itself the defensive benefits of a class action or mass action while depriving customers of the plaintiff's benefits of a class or mass action. Further, the possibility of repeat business from Suddenlink would create a conflict of interest for the arbitrator.

### G. Suddenlink's Effort to Encroach on the Province of the Court

88.    In the event a Court finds, for example, that the prohibition on individualized relief is unconscionable, the Suddenlink adhesion contract seeks to dictate the time and manner in which the Court administers justice:

> If any of the prohibitions in the preceding paragraph is held to be unenforceable as to a particular claim or request for relief (such as a request for public injunctive relief), then You and Suddenlink agree that such claim or request for relief (and only that claim or request) shall be *decided by a court **after** all other claims and requests for relief are arbitrated*. In that instance, or any instance when a claim between You and Suddenlink proceeds to court rather than through arbitration, You and Suddenlink each *waive the right to any trial by jury* through this Agreement.

SA 24(h) (emphasis added).

89.    In seeking to enforce this provision, Suddenlink sets up another blockade to evade justice and deprive customers of both their property and Constitutional rights, including the right to trial by jury.

90.    Further, by imposing a bifurcated justice system, Suddenlink also burdens the Court and customer with costs and inefficiencies.  In addition, because the "preceding paragraph" includes a prohibition on class actions, Suddenlink's inclusion of this bifurcation requirement is merely a veiled effort to lay the foundation for the claim that the customer cannot serve as a class representative, as Suddenlink will argue that the customer, having already adjudicated all or part of the claim in arbitration, is no longer "typical" of other class members, whose claims have not been submitted to arbitration.

91.    This insidious effort to monkey wrench the wheels of justice demonstrates why the Court cannot trust that any part of the Suddenlink adhesion contract is not unconscionable and should reject it in its entirety.

92.     In recognition that the Suddenlink adhesion contract contains unconscionable terms, the Suddenlink adhesion contract also seeks to have the Court sanitize it and then enforce whatever remains in the hope that other unconscionable terms escaped initial scrutiny. *See, e.g.,* SA 24(j) ("If any other portion of this arbitration provision is determined to be unenforceable, then the remainder of this arbitration provision shall be given full force and effect."); SA 26 ("If any term or condition of this Agreement shall be adjudicated or determined as invalid or unenforceable by a court, tribunal or arbitrator with appropriate jurisdiction over the subject matter, the remainder of the Agreement with respect to such claim shall not be affected and shall remain valid and enforceable to the fullest extent permitted by law."). Given the Suddenlink adhesion contract's length, ever-changing terms, incorporation of numerous other documents, insidious veiled provisions, and overall unfairness, such a result would not only offend any notion of equity, but would also unduly burden the Court and Plaintiff, and reward Suddenlink for imperious behavior.

**H.  Suddenlink's Failed Infrastructure**

93.     Suddenlink services are characterized by frequent unpredicted prolonged outages, sometimes at a single home in a neighborhood, sometimes throughout an entire neighborhood.

94.     Such outages are consistent with several types of failures.

95.     First, Suddenlink likely utilizes equipment that is past what manufacturers call "End of Life" ("EOL"). Once equipment passes EOL, it not only unpredictably ceases to operate, but it also is past the date its manufacturer provides software updates, sells spare parts, or is willing to provide service to repair malfunctions. As a consequence, any equipment breakdown takes much longer to repair.

96.     Second, Suddenlink likely fails to maintain and upgrade its infrastructure and hardware. In states with adequate high speed internet, phone, and video services, provider crews

are frequently seen proactively upgrading and maintaining equipment related to the delivery of those services. Suddenlink personnel are rarely if ever seen performing proactive work to maintain and upgrade equipment.

97.    Third, Suddenlink fails to proactively manage vegetation along its lines. In Oklahoma, vegetation encroachment and hazardous trees are a major problem that ultimately result in damage to facilities and repeated service interruptions, especially in rural areas. Suddenlink is aware of this, but simply relies on the electric companies to maintain the vegetation along its lines.

98.    Fourth, Suddenlink fails to hire experienced technicians or adequately train its employees. As a result, equipment failures take longer to repair. Further, inexperienced and inadequately trained technicians are prone to commit configuration and other errors leading to disruptions in service.

99.    Fifth, Suddenlink likely fails to utilize N+1 redundancy in either an "active / active" or "active / passive" configuration for mission critical equipment. N+1 redundancy for active / active equipment means having one more piece of mission critical equipment than necessary active, so that if one piece of equipment fails, the remaining active systems can carry the load. N+1 redundancy for active / passive equipment means having one more piece of mission critical equipment than necessary on standby, so that if one piece of equipment fails, the failed equipment can be immediately replaced, minimizing any service disruptions. Suddenlink's failure to utilize N+1 redundancy means that Suddenlink's system lacks resilience and guarantees longer than necessary service interruptions when mission critical equipment fails.

100.    Karen Macon, Director of the Commission Utilities Division, detailed the decline of Suddenlink's performance in West Virginia since Altice took over operations. She believes the decline is attributable to Altice's decisions to hire the Altice Technical Service Division, move

technicians and fire qualified employees, inadequately train and monitor contractors, close its West Virginia call center and outsource its call centers internationally. Staff Ex. 9. She views Altice's decisions as focused more toward cost-cutting and without regard to customer service. Tr. II at 158. She believes that Suddenlink failed to provide safe, reliable and adequate service in the State of West Virginia. Order at 25. Each of these conclusions apply equally to Suddenlink service in Oklahoma.

101.    Suddenlink's lack of attention to facilities and customers' needs is recognized by its employees. Suddenlink's witness at the hearing that gave rise to the Order, Pragash Pillai, the Executive Vice-President of Operations for Altice USA, testified that since the Altice acquisition, Suddenlink has not been doing a good job. *Id.* (citing Tr. I at 159-163).

### I.    Suddenlink's Misrepresentations

102.    Suddenlink makes multiple misrepresentations concerning its services.

103.    Example 1:




104.    As is evident from this Complaint's preceding paragraphs, Suddenlink has neither Speed nor Reliability. Customers do not experience "fast, reliable connectivity". Suddenlink does not have an "enhanced network".

105.    Suddenlink does not have a "100% fiber internet network". In fact, on February 16, 2022, Altice CEO Dexter Goei said that

Lastly, I want to highlight that we announced today a new plan to bring 100 [Inaudible] fiber broadband, delivering multi-gig speeds to more than two-thirds of our entire footprint over the next four years, reaching a total of 6.5 million FTTH passings by the end of 2025. This will include about four million fiber passings at Optimum, covering all the areas where we overlap with FiOS and Frontier and 2.5 million fiber passings at Suddenlink. Fiber is the future, and given the progress we have made at Optimum with our fiber build, we're excited to build on that success and break ground later this year at Suddenlink to bring our state-of-the-art network to more customers and communities.

https://www.fool.com/earnings/call-transcripts/2022/02/16/altice-usa-inc-atus-q4-2021-earnings-call-transcri/ (emphasis added).  From Goei's statement, it is evident that Altice had **plans to build** a fiber network at Suddenlink, but as of the date Suddenlink claimed to have a "100% fiber internet network", Suddenlink merely intended to "break ground later this year" on that fiber network.

106.    Example 2:

Is Suddenlink Internet cable or DSL?

Our internet service is brought into your household via a cable connection to our larger fiber optic network.

107.    Suddenlink does not connect any household to a "larger fiber optic network" because Suddenlink has yet to "break ground" in building the network.

108.    Example 3:



109.    As is evident from this Complaint's preceding paragraphs, you cannot "get help when you need it" from Suddenlink or even "get help".  Suddenlink is not "committed to customer service."  Suddenlink has the worst customer service and experience in the industry.

110.    Example 4:

 

111.    As is evident from this Complaint's preceding paragraphs, Suddenlink does not

offer Value or Transparency.  Suddenlink does not let anyone "[e]njoy premium internet at great

pricing".  Constant buffering and interruptions make it impossible to "enjoy" Suddenlink's

internet.  Suddenlink's internet is not "premium".  The pricing is not "great" or "low" for the

service provided.

112.    As is evident from this Complaint's preceding paragraphs, the offers are not

"transparent" and Suddenlink's bills are rife with "hidden fees" and inexplicable charges, and

chalk full of "surprises".  Suddenlink's bills are harder to understand than those of any other

provider.

113.    Example 5:

  

114.    Suddenlink sells customers levels of internet service (1 Gig, 500 Mbps, or 300 Mbps), but fails to deliver those levels.  As is evident from this Complaint's preceding paragraphs, in numerous Suddenlink service areas, the network is incapable of delivering the level of service sold.

115.    Example 6:

Suddenlink

**Blazing fast speeds**
Offers up to 1 GB Internet²



116.    As is evident from this Complaint's preceding paragraphs, Suddenlink does not provide "Blazing fast speeds" and, although Suddenlink "Offers up to 1 GB Internet", Suddenlink typically cannot deliver 1 GB Internet.

117.    Example 7:



Stay connected on our next-generation network

We've built a powerful network to connect faster than ever with Internet services up to 1 Gig available in most areas. Plus, get 24/7 customer support.

118.    As is evident from this Complaint's preceding paragraphs, a customer cannot "Stay connected" on Suddenlink's network – that is one of the major problems with the service.

119.    As is evident from this Complaint's preceding paragraphs, Suddenlink's network is not "next generation" and Suddenlink has not "built a powerful network".  Suddenlink has yet to "break ground" on building the network.  Suddenlink's existing network is dated and deteriorating.

120. As is evident from this Complaint's preceding paragraphs, a customer cannot "connect faster than ever" because the network continues to deteriorate, making connections slower.

121. As is evident from this Complaint's preceding paragraphs, 1 Gig only is "available" in the sense that Suddenlink will sell that level of service but fail to deliver it.

122. As is evident from this Complaint's preceding paragraphs, a customer cannot get "customer support". A customer can call and listen to a frustrating and lengthy recording about rebooting the modem, then be transferred to an inadequately trained person in a foreign land who has not been given the resources or information needed to solve the customer's problem.

123. Example 8: Suddenlink claims to offer services "without a contract" and to have "thrown out contracts".

124. As is evident from this Complaint's preceding paragraphs, Suddenlink simultaneously harbors the covert claim that all customers are bound by at least 6 but possibly 50 unsigned, lengthy, self-contradictory, hard-to-find, internet-posted, ever-changing, take-it-or-leave-it "agreements".

## III. CLASS ACTION

125. Plaintiff brings this case on behalf of himself and as a class action under Fed. R. Civ. P. 23(b)(2) and 23(b)(3) on behalf of all members of the following Statewide Class: All Oklahoma customers of Suddenlink Video Service, Phone Service, and High Speed Internet Service from January 1, 2016 to the present.

126. Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the class should be expanded or otherwise modified.

127.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). Thousands of Suddenlink customers have experienced damages caused by Suddenlink's inadequate provision of services. Individual joinder of all Class members is impracticable.

128.    The Class is ascertainable because its members can be readily identified using customer information. Plaintiff anticipates providing appropriate notice to the certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification or pursuant to court order under Fed. R. Civ. P. 23(d).

129.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for the Class predominate over questions affecting only individual Class members. These include, without limitation, the following:

   a.    The enforceability of the Suddenlink adhesion contract;

   b.    Defendants' conduct in providing Phone Service, High Speed Internet Service, and Video Service; and

   c.    Whether Defendants' conduct gives rise to the causes of action set forth herein.

130.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of the Class members and arise from the same course of conduct by Defendants. The relief Plaintiff seeks is typical of the relief sought for the absent Class members.

131.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex class actions.

132.    Plaintiff and Plaintiff's counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor counsel have interests adverse to those of the Class.

133.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by the individual Class members on the claims asserted herein would create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for Defendants; and because adjudication with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members, or impair substantially or impede their ability to protect their interests.

134.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class member.

135.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and fact regarding Defendants' conduct and responsibility predominate over any questions affecting only individual Class members.

136.    No Class member has initiated an action against Defendants. Should those Class members bring additional actions against Defendants, the burden imposed on the judicial system by such individual litigation would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A) and Fed. R. Civ. P. 23(b)(3)(B).

137.    No judicial forum understands the provision of services to residents of this judicial district better than the Western District of Oklahoma, making the concentration of claims in this judicial district ideal under Fed. R. Civ. P. 23(b)(3)(C).

138.    The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

139.    Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Fed. R. Civ. P. 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiff or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Fed. R. Civ. P. 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Fed. R. Civ. P. 23(c)(5) to divide any Class into subclasses.

140.    The undersigned counsel for Plaintiff and the Class request that this Court appoint them to serve as Class counsel; first on an interim basis and then on a permanent basis pursuant to Fed. R. Civ. P. 23(g). Undersigned counsel will fairly and adequately represent the interests of the

Class, have identified or investigated the Class' potential claims, are experienced in handling class actions, other complex litigation, and claims of the type asserted in this action, know the applicable law, will commit sufficient resources to represent the Class, and are best able to represent the Class.

141.    No alternative to this class action exists. If Defendants' substandard services persist, Oklahoma residents will continue to suffer unabated harm. For injunctive relief to be effective, Defendants' services must improve.

142.    In the paragraphs set forth below, all references to Plaintiff apply to the Class Members as well.

## IV.    PUNITIVE DAMAGES

143.    Suddenlink acted with actual malice toward Plaintiff and/or with conscious, reckless, and outrageous indifference to the health, safety, and welfare of others. Therefore, where applicable, Plaintiff seeks punitive damages.

### COUNT I
### (Declaratory Judgment / Unenforceable Contract)

144.    Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

145.    An actual controversy exists between Defendants and Plaintiff concerning the enforceability of the Suddenlink adhesion contract.

146.    Pursuant to 28 U.S.C. § 2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

147.    If enforced, the Suddenlink adhesion contract would impose unreasonably burdensome costs upon or would have a substantial deterrent effect upon a person seeking to enforce and vindicate rights and protections or to obtain statutory or common-law relief and

remedies that are afforded by or arise under state law that exists for the benefit and protection of the public.

148.    Plaintiff seeks a declaration that the Suddenlink adhesion contract is an unenforceable contract of adhesion and void for a lack of consideration.

149.    Plaintiff seeks a declaration that any provision of the Suddenlink adhesion contract that restricts Suddenlink's liability or reduces Suddenlink's responsibility to provide service is unenforceable.

150.    Plaintiff seeks a declaration that the Suddenlink adhesion contract's restrictions on bringing a lawsuit, having a jury trial, and/or class action status are unenforceable.

151.    Plaintiff seeks a declaration that the Suddenlink adhesion contract's restrictions on obtaining relief that benefits other customers are unenforceable.

152.    Plaintiff seeks a declaration the each of the Suddenlink adhesion contract provisions set forth in this Complaint are declared void and have no effect.

153.    Plaintiff seeks a declaration that Suddenlink is not entitled to collection and/or attorney's fees in the event that a customer shall find it necessary to enforce collection or to preserve and protect its rights under the Suddenlink adhesion contract.

154.    If the Court determines that this matter should be referred to arbitration, then Plaintiff seeks a declaration that: (a) Suddenlink must pay all fees and costs associated with the arbitration; and (b) no terms of the Suddenlink adhesion contract are binding on the arbitrator.

155.    If the Court determines that the arbitration provision should be enforced as written, then Plaintiff seeks a declaration that: (a) no person may serve as arbitrator on more than one Suddenlink customer arbitration; and (b) Suddenlink may not utilize testimony from one arbitration in any other arbitration.

## COUNT II
### (Unjust Enrichment / Quasi Contract)

156.    Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

157.    Defendants accepted payment from Plaintiff for providing high speed internet and video service.

158.    Defendants have failed to provide such service equivalent in value to the payments received from Plaintiff.

159.    Defendants received payments to which they were not entitled based on Plaintiff's mistaken belief that Defendants provided actual high speed internet and video service.

160.    Further, Defendants obtained payments through actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of customers' weakness or necessities, or through any other similar circumstances which render it unconscientious for Defendants to retain the payments.

## COUNT III
### (Negligence)

161.    Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

162.    Defendants owed a duty of care to the Plaintiff, including but not limited to taking steps to provide reliable and consistent: (a) high speed internet, phone, and video service; (b) repair service; and (c) call centers.

163.    The paragraphs above are replete with allegations that demonstrate Defendants' extreme recklessness in providing high speed internet, phone, and video service.

164.    These failures violated Defendants' duty of care to Plaintiff.

165.    As a direct and proximate result of Defendants' negligence, gross negligence, and willful and reckless conduct, Plaintiff has suffered and will continue to suffer harm and is entitled to damages.

### COUNT IV
### (Breach of Contract)

166.    Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

167.    Assuming the Suddenlink adhesion contract is valid and enforceable, Plaintiff and Suddenlink entered into a contract, called a Residential Services Agreement, whereby Suddenlink agreed to provide services in exchange for payments from Plaintiff.

168.    Plaintiff performed all of his obligations under the contract.

169.    Assuming Suddenlink has obligations under the contract – which would be a prerequisite to determining an enforceable contract exists – Suddenlink failed to perform its obligations to Plaintiff.

170.    As a direct, proximate, and legal result of Suddenlink's breach of contract, Plaintiff has suffered damages.

### COUNT V
### (Outrage / Emotional Distress)

171.    Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

172.    Suddenlink's conduct was and is atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency.

173.    Suddenlink either acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from its conduct.

174.    Suddenlink's actions caused Plaintiff to suffer emotional distress.

175.    The emotional distress Plaintiff suffered was so severe that no reasonable person could be expected to endure it.

176.    As a direct, proximate, and legal result of Suddenlink's infliction of emotional distress, Plaintiff has suffered damages.

## COUNT VI
### (Deceptive Trade Practices)

177.    Plaintiff incorporates by reference the allegations contained in this Complaint's preceding paragraphs.

178.    Defendants have violated 78 OK Stat. § 78-53(A) (2, 3, 5, 7, 9, & 10) (2014).

179.    Defendants are liable under 78 OK Stat. § 78-54(A).

180.    Defendants Altice USA, Cequel III Communications I, LLC, and Cequel III Communications II, LLC are located in and engaged in these deceptive trade practices in the conduct of business, trade or commerce and in the furnishing of service in the state of New York.

181.    Plaintiff has been injured by reason of Altice USA's, Cequel III Communications I, LLC's, and Cequel III Communications II, LLC's violation of NYGBS § 349, and brings an action in his own name to enjoin such unlawful act or practice and to recover his actual damages or fifty dollars, whichever is greater. Plaintiff further requests that the court increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, because Altice USA, Cequel III Communications I, LLC, and Cequel III Communications II, LLC willfully or knowingly violated NYGBS § 349.

182.    Defendants willfully engaged in a deceptive trade practice and the Court may award Plaintiff reasonable attorneys' fees.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendants and in favor of Plaintiff and that it grant the requested equitable relief; all damages permissible under law, including punitive damages; attorneys' fees and costs; pre-judgment and post-judgment interest; and any further relief the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all claims and of all issues so triable.

Dated: August 3, 2022

Tim Hoch
OBA No. 15258
Hoch Law Firm, PC
101 Park Avenue
Suite 1300
Oklahoma City, OK 73102
Phone: (817) 731-9703
Fax: (817) 731-9706
Email: tim@hochlawfirm.com

The Webb Law Centre, PLLC
Charles R. "Rusty" Webb [+]
716 Lee St. E.
Charleston, West Virginia 25301
Phone: (304) 344-9322
Fax: (304) 344-1157
Email: rusty@rustywebb.com

Franklin Scott Conway LLP
J. Andrew Scott [^]
1629 K St NW #300
Washington, DC 20006
Phone: (202) 688-3200
Fax: (800) 727-0659
Email: ascott@fsc.legal

Talcott Franklin P.C.
Talcott J. Franklin [*]
181 Western Promenade
Portland, Maine 04102
Phone: (214) 642-9191
Fax: (800) 727-0659
Email: tal@talcottfranklin.com

[+] Licensed only in West Virginia. *Pro hac vice* motion to be filed.
[^] Licensed only in Texas. *Pro hac vice* motion to be filed.
[*] Licensed only in Maine, Michigan, North Carolina, South Carolina (inactive), and Texas. *Pro hac vice* motion to be filed.

Original content © 2022 Talcott Franklin P.C.
No claim to government works.